UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | Civil No. _____ |
| | : | |
| v. | : | |
| | : | |
| VIMPELCOM LTD, | : | **COMPLAINT** |
| | : | |
| Defendant. | : | |
| | : | |
| _____ | : | |

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## SUMMARY OF ALLEGATIONS

1.     This matter arises from violations of the anti-bribery, recordkeeping, and internal accounting controls provisions of the Foreign Corrupt Practices Act ("FCPA")[15 U.S.C. §§ 78dd-1, 78m(b)(2)(A)-(B)] by defendant VimpelCom Ltd ("VimpelCom").

2.     From 2006 to at least 2012, VimpelCom offered and paid bribes to a government official in Uzbekistan in connection with its Uzbek operations. During the course of the bribery scheme, VimpelCom made or caused to be made at least $114 million in improper payments in order to obtain and retain business that generated more than $2.5 billion in revenues for VimpelCom.

3.     These payments were primarily made through sham contracts, but were also, in certain instances, made under the guise of legitimate charitable contributions or sponsorships. These payments were improperly characterized in the books of records of VimpelCom's subsidiaries as legitimate expenses, and consolidated in VimpelCom's financial statements which were filed with the Commission throughout the relevant period.

## JURISDICTION AND VENUE

4.      This court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. VimpelCom, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

5.      Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain acts or transactions constituting the violations by VimpelCom occurred in this district.

## DEFENDANT

6.      **VimpelCom Ltd** ("VimpelCom") is a corporation organized under the laws of Bermuda.  VimpelCom was headquartered in Moscow, Russia until 2010, when it moved its headquarters to Amsterdam, the Netherlands.  VimpelCom issues and maintains a class of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, which are now traded on the NASDAQ, and were traded on the New York Stock Exchange prior to September 2013.

7.      VimpelCom is a global provider of telecommunications services. VimpelCom operates through subsidiaries and affiliates in Europe, Asia, and Africa. VimpelCom manages its operations through separate regional business units, which are each overseen by an officer of VimpelCom and member of the senior management group.

## RELATED ENTITIES AND PERSONS

8.      **Unitel LLC** ("Unitel") is VimpelCom's wholly-owned subsidiary and provides

2

mobile telecommunications services in Uzbekistan.  Unitel was formed in Uzbekistan, and it was
purchased by VimpelCom in 2006. Unitel is part of VimpelCom's Commonwealth of Independent
States ("CIS") business unit and is managed by local managers as well as a supervisory committee
which includes senior members of the CIS business unit management.

9.      **Buzton JV Ltd** ("Buzton") is VimpelCom's majority-owned subsidiary and
provides fixed-line telecommunications services in Uzbekistan. Buzton was formed in Uzbekistan
and a majority interest was purchased by VimpelCom in 2008. Buzton is part of the CIS business
unit and, like Unitel, is managed by local managers and a supervisory committee largely comprised
of senior members of the CIS business unit management.

10.     **Freevale Enterprises** ("Freevale") is VimpelCom's wholly-owned subsidiary and
acts as one of two holding companies of Unitel. Freevale was formed in the British Virgin Islands
and was purchased by VimpelCom in 2006 as part of its acquisition of Bakrie Uzbekistan
Telecom ("Buztel"), a separate mobile telecommunications operator in Uzbekistan that was
merged into Unitel following its acquisition. Freevale has no operations and no holdings other than
Unitel.

11.     **Silkway Holding BV** ("Silkway") is VimpelCom's wholly-owned subsidiary and
acts as one of two holding companies of Unitel. Silkway was formed in the Netherlands and was
purchased by VimpelCom in connection with its 2006 acquisition of Unitel. Silkway has no
operations and no holdings other than Unitel.

12.     **Local Partner A** was an Uzbek government official at all relevant times. Local
Partner A was also a close relative of a high-ranking Uzbek government official and VimpelCom
understood that Local Partner A had significant influence over other Uzbek government officials.
Local Partner A operated through numerous shell companies, including Takilant Ltd.

3

13.     **Takilant Ltd** is a company beneficially owned by Local Partner A and operated by close associates of Local Partner A at all relevant times. Takilant was formed in Gibraltar and was the entity through which VimpelCom made payments to Local Partner A.

## STATEMENT OF FACTS

14.     VimpelCom is a global telecommunications company operating through a network of subsidiaries and joint venture entities. VimpelCom is organized by geographic business units, each of which is directly supervised by a member of the management board. The management board includes senior officers of VimpelCom and VimpelCom's chief executive officer and chief financial officer.

15.     VimpelCom entered the Uzbek market in 2006, through its acquisitions of Unitel and Buztel. Throughout the relevant period, Unitel and Buztel (until Buztel was merged into Unitel in July 2006) were subject to regulation by the Communications and Information Agency of Uzbekistan ("ACI"). ACI is the Uzbek regulatory authority that issues licenses, frequencies, channels, and number blocks necessary for VimpelCom to operate in that country. Throughout the relevant period, in Uzbekistan private parties could not sell or purchase licenses, frequencies, channels, or number blocks.

16.     Unitel is part of the CIS business unit of VimpelCom, which had its own executive officers who in turn supervise the local managers in Uzbekistan. Financial results for Unitel are reported in the CIS business unit results which are consolidated with the other geographic business units into the financial results reported by VimpelCom. From at least 2005 to at least 2012, VimpelCom dealt with representatives of Takilant and maintained a relationship with Local Partner A, who was an Uzbek government official and family member of the President of Uzbekistan. VimpelCom understood that Local Partner A was able to exert

4

significant influence over other Uzbek officials to cause them to take official action that would benefit VimpelCom's business in Uzbekistan.

17.     Over the course of the relevant period, VimpelCom made or caused to be made at least $114 million in improper payments to Local Partner A through Takilant, through a series of transactions that were designed to obfuscate their true purpose. Most of the transactions designed to benefit Local Partner A through Takilant were denominated in United States dollars, and communications concerning those transactions were conducted, in part, using electronic mail accounts on United States-based servers.

## Entry Into Uzbekistan

18.     In 2005, VimpelCom was evaluating whether to enter the Uzbek telecommunications market and considered purchasing certain companies with existing operations in Uzbekistan. In January 2006, VimpelCom announced the acquisition of Buztel with 2,500 subscribers for the purchase price of approximately $60 million, and in February 2006, VimpelCom announced the acquisition of Unitel with 300,000 subscribers for the purchase price of approximately $200 million.

19.     In order to acquire Buztel and Unitel, then senior managers of VimpelCom had negotiated with Unitel, Buztel, and representatives of Local Partner A. Senior managers of VimpelCom directly involved in the transaction understood that a relationship with Local Partner A was required in order to enter the market and that it could only acquire these entities with the assistance of Local Partner A.

20.     In December 2005, senior management discussed with members of the board of directors how Local Partner A was actively influencing the potential sales of Unitel and Buztel, that Local Partner A was a partner in Buztel, and that Local Partner A could approve or

disapprove any bidders for Unitel and probably also influence the price for Unitel.

21.     At the time of these acquisitions, certain VimpelCom senior managers directly involved with the transaction understood that Local Partner A would exercise improper influence over other Uzbek government officials in exchange for an ownership stake in the acquired companies and other payments. In connection with its entry into the Uzbek telecommunications market in 2006, VimpelCom approved a plan to enter into an ostensible consulting agreement with Takilant through which Local Partner A received an improper payment of $2 million.

22.     In July 2006, VimpelCom merged Buztel into Unitel, which resulted in VimpelCom-owned holding companies Silkway and Freevale owning 79 percent and 21 percent of Unitel respectively.

## Ownership Stake Provided to Local Partner A Through Takilant

23.     In June 2007, VimpelCom sold to Takilant a 33.3 percent ownership stake in Freevale. The purchase price paid by Takilant was $20 million, and the agreement also contained a put option which allowed Takilant to sell the interest back to VimpelCom in 2009 for a minimum price of $57.5 million.

## 3G Market Expansion

24.     Later in 2007, VimpelCom sought to develop a 3G network in Uzbekistan. At the time of their acquisition, neither Buztel nor Unitel had the necessary licenses and permission from ACI to operate a 3G network. In order to obtain the necessary licenses and permission, VimpelCom engaged in a scheme with representatives of Local Partner A whereby VimpelCom paid Local Partner A through Takilant to exert improper influence over ACI to issue the required 3G licenses.  Under this arrangement, ACI would issue the 3G licenses to a Takilant subsidiary, which in turn would repudiate the licenses so they would instead be issued to Unitel.  Numerous

red flags were raised by structuring the 3G license transaction, not the least of which was the knowledge by then senior VimpelCom executives that private parties in Uzbekistan could not directly transfer telecommunications licenses between themselves.

25.     VimpelCom's board of directors and Finance Committee approved the 3G license transaction in October 2007, and an agreement with Takilant was executed later that month. VimpelCom paid Takilant $25 million in connection with the 3G license transaction, and recorded the 3G license transaction as an intangible asset and a receivable to its shell holding company, Watertrail Industries Ltd.

26.     In connection with the 3G license, VimpelCom paid Local Partner A through Takilant using funds paid by Watertrail in 2007, which is a VimpelCom holding company for operations other than Uzbekistan. Watertrail had no role in VimpelCom's Uzbek operations in 2007, and was simply used in this transaction by VimpelCom as a vehicle for these payments.

### Repurchase of Local Partner A's Ownership Stake Held Through Takilant

27.     Takilant exercised its put option in 2009 to sell its interest in Freevale back to VimpelCom, and on September 25, 2009, VimpelCom announced that it had repurchased Takilant's ownership stake for $57.5 million- which represented a return of nearly 200 percent over the initial sales price in approximately twenty-seven months.  Certain consulting fees and the re-purchase amount were paid by VimpelCom to Local Partner A through Takilant.

### 4G Market Expansion

28.     By 2011, 4G networks were appearing in other countries and VimpelCom determined it would operate a 4G network in Uzbekistan. To achieve this, VimpelCom again turned to Local Partner A through Local Partner A's representatives.

29.     Many of the same red flags identified during the 3G license transaction existed for

7

the 4G license transaction. The counterparty to Takilant was the same counterparty from the 3G license transaction which again was a VimpelCom subsidiary that did not have any relationship to the Uzbek operations, but rather was a shell holding company for other operations. VimpelCom knew that under the laws of Uzbekistan a 4G license could be obtained directly from ACI and that licenses did not require up-front payment.

30.     To justify the payments made in connection with the licenses, Takilant supplied fake technical reports to provide the appearance that legitimate services had been provided. The fake technical reports were cut and pasted from online sources, publicly-available materials, and Unitel's own reports. VimpelCom accepted the fake technical reports without question as services for the payment to Takilant, which was intended to improperly benefit Local Partner A.

31.     Unlike the 3G license transaction, the 4G license transaction was not presented to the board of directors or the Finance Committee of the board. Instead, the 4G license transaction was reviewed as part of a management process called B-FLAT (Business, Fiscal, Legal, Accounting, and Treasury). B-FLAT was designed to give functions outside of the business group visibility into significant transactions. While several members of B-FLAT questioned the structure of the 4G license transaction and raised concerns to more senior officers of VimpelCom, the transaction proceeded as proposed. Ultimately, the B-FLAT members approved the 4G license transaction and VimpelCom paid $30 million to Local Partner A through Takilant. Unitel recorded an intangible asset and a payable to Watertrail.

32.     In connection with the 4G license, VimpelCom also paid Local Partner A through Takilant using funds paid by Watertrail. Watertrail had no role in VimpelCom's Uzbek operations in 2011, and was simply used in this transaction by VimpelCom as a vehicle for these payments.

33.     For several years, VimpelCom was not able to build a 4G network in Uzbekistan. In early 2014, VimpelCom announced that it would take a $30 million impairment charge related to the 4G license.

### Payments to Local Partner A Using Takilant as a Fake Vendor

34.     Following VimpelCom's re-purchase of Local Partner A's indirect ownership stake in Freevale and the 3G and 4G license transactions, new mechanisms were developed to pay Local Partner A.  One of those mechanisms was to make payments to Local Partner A through Takilant as a fake vendor.

35.     Due to currency restrictions in Uzbekistan, Unitel had an excess of the local Uzbek currency and a deficit of hard or foreign currency. In order to pay Local Partner A in U.S. dollars, a then senior VimpelCom manager along with then senior officers of Unitel and then senior members of the CIS business unit structured a series of layered transactions. The layering of transactions was to disguise payments ultimately made to Local Partner A through Takilant as payments to vendors in the local Uzbek currency in exchange for fake or inflated construction and research services. The vendors provided the exchange of local Uzbek currency into United States dollars. The vendors subcontracted to affiliates of the vendors who in turn subcontracted (through financial intermediaries) to Takilant. The payments from vendors to affiliates and then affiliates to Takilant were denominated in United States dollars. The layered vendor structure provided a way for VimpelCom to reduce excess local Uzbek currency at Unitel while providing U.S. dollars to Takilant and thereby to Local Partner A.  Using this process, VimpelCom improperly paid a further $10 million to Local Partner A through Takilant in both 2011 and 2012.

**Payments to Charities**

36.     In addition to direct payments to Local Partner A through Takilant, VimpelCom also made what were ostensibly charitable payments in order to improperly influence Local Partner A.  In connection with corruptly influencing Local Partner A, representatives of Local Partner A directed VimpelCom to make at least $502,000 in payments to charities directly affiliated with Local Partner A.

37.     Unitel had insufficient internal accounting controls and maintained inaccurate books and records regarding its charitable contributions.  From 2009 and through 2013, Unitel provided approximately $38 million in sponsorships or charitable contributions in Uzbekistan. Despite the presence of red flags, these transactions were not vetted to ensure that they were not improperly benefitting government officials.

## FIRST CLAIM FOR RELIEF

### Unlawful Payments

### [Violations of Exchange Act Section 30A]

38.     Paragraphs 1 through 37 are re-alleged and incorporated by reference.

39.     As described above, VimpelCom corruptly offered, promised to pay, or authorized unlawful payments to one or more persons, while knowing that all or a portion of those payments would be offered, given, or promised, directly or indirectly, to foreign officials for the purposes of influencing their acts or decisions in their official capacity, inducing them to do or omit to do actions in violation of their official duties, securing an improper advantage, or inducing such foreign officials to use their influence with a foreign government or instrumentality thereof to assist VimpelCom in obtaining or retaining business.

40.     By reason of the foregoing, VimpelCom violated, and unless enjoined will

continue to violate, the anti-bribery provisions of Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

## SECOND CLAIM FOR RELIEF

### Corporate Books and Records

### [Violations of Section 13(b)(2)(A) of the Exchange Act]

41.     Paragraphs 1 through 37 are re-alleged and incorporated by reference.

42.     Section 13(b)(2)(A) of the Exchange Act requires each issuer with securities registered with the Commission pursuant to Section 12 [15 U.S.C. § 78*l*] to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and the dispositions of the assets of the issuer.

43.     As described above, VimpelCom, through its officers, employees, and agents, failed to keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and the disposition of its assets.

44.     By reason of the foregoing, VimpelCom violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C § 78m(b)(2)(A)].

## THIRD CLAIM FOR RELIEF

### Internal Accounting Controls

### [Violations of Section 13(b)(2)(B) of the Exchange Act]

45.     Paragraphs 1 through 37 are re-alleged and incorporated by reference.

46.     Section 13(b)(2)(B) of the Exchange Act requires issuers of registered securities to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things, transactions are executed in accordance with management's general or specific authorization; transactions are recorded as necessary to permit preparation of

financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements; transactions are recorded as necessary to maintain accountability for assets; and access to assets is permitted only in accordance with management's general or specific authorization.

47.     VimpelCom failed to devise and maintain such a system of internal accounting controls and was therefore unable to record the nature and purpose of, or prevent, the provision of monies and things of value to government officials, as set forth above.

48.     By reason of the foregoing, VimpelCom violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter judgment:

a.    Permanently enjoining VimpelCom from violating Sections 13(b)(2)(A), 13(b)(2)(B), and 30A of the Exchange Act [15 U.S.C. §§ 78dd-1, 78m(b)(2)(A), and 78m(b)(2)(B)];

b.    Ordering VimpelCom to disgorge ill-gotten gains wrongfully obtained as a result of its illegal conduct described herein, plus prejudgment interest thereon; and

c.    Granting such other relief as this Court may deem just and appropriate.

Dated:  February 18, 2016

Respectfully submitted,

Paul G. Gizzi
Securities and Exchange Commission
200 Vesey St, Suite 400
New York, New York 10281

Charles E. Cain (not admitted in SDNY)
Tonia J. Tornatore (not admitted in SDNY)
Securities and Exchange Commission
100 F St NE
Washington, DC 20549

Telephone:  (212)336-0077 (Gizzi)
E-Mail:  gizzip@sec.gov
Attorneys for Plaintiff